**Esther Kortlander Bangert, Appellant, v. Henry John Bangert, Appellee.**

### Gen. No. 28,798.

1. HUSBAND AND WIFE—*when wife's separation not excused by her insanity.*  Where a wife left her husband without his knowledge or consent and returned to her father's home, due to her ill health and mental condition, and was there deemed and adjudged insane and sent to an institution from which she was afterward discharged as cured, and the husband, not having heard directly from her, closed their home and sold their furniture two months after she left him and, until that time at least, stood ready and willing to receive and support her, she should, on regaining her sanity, have offered to return to her husband and, in the absence of proof that she did so or of conduct on his part justifying the separation, she stands in the position of consenting to it and cannot maintain a suit for separate maintenance.

2. HUSBAND AND WIFE—*separation when justifiable.*  No encouragement can be given by the courts to the living apart of husband and wife, and incompatability of disposition, occasional ebullitions of passion, trivial difficulties or slight moral obliquities will not justify separation.

3. HUSBAND AND WIFE—*no separate maintenance to wife unwilling to return.*  A suit for separate maintenance cannot be maintained by a wife when, on the proofs, she stands unwilling to return to him and he stands apparently willing and requiring that she should return and there is no proof of actionable misconduct on his part.

4. HUSBAND AND WIFE—*separate maintenance suit barred by incompetency of plaintiff.*  If a complainant in a suit for separate maintenance, though entitled to relief, was not in a state of mind to consent to the institution of the proceedings an objection to maintenance of the suit on that ground, if properly raised, would be pertinent.

5. HUSBAND AND WIFE—*pleading insanity to separate maintenance*

*suit.* Where a suit for separate maintenance is brought in the name of the wife the question of her sanity may be raised only by a plea in abatement.

Appeal by plaintiff from the Circuit Court of Cook county; the Hon. IRA RYNER, Judge, presiding. Heard in the second division of this court for the first district at the October term, 1923. Affirmed. Opinion filed April 3, 1924.

WISNER & WALSH, for appellant; CHANNING L. SENTZ, of counsel.

HARRY D. KNIGHT, for appellee.

MR. JUSTICE BARNES delivered the opinion of the court.

Appellant filed a bill for separate maintenance, and appellee a cross-bill for divorce on the ground of desertion. Both were dismissed for want of equity. There was no appeal by cross-complainant.

Complainant testified that about two months after marriage in June, 1917, she was seized with uncontrollable crying spells and certain fears and obsessions; that she was under medical attention during the autumn months of that year, and not improving went to her father's home in Grand Rapids, Michigan, December 1st, where she was in a state of collapse and nervous exhaustion and under a doctor's care. She thought she was losing her mind and told her husband so. In January, 1918, she was brought back to Chicago and taken to Columbus Memorial hospital where she remained about two weeks. On account of her "spells" she did not want to go home but was told by her husband if she did not he would close their apartment. She went home, and the next month was taken to a sanitarium where she "went all to pieces," and was sent to St. Mary's Hill in Milwaukee, Wisconsin, remaining there about two months. Her husband saw her at these different institutions, but complaining of expenses and attributing her condition to

"meanness of disposition" demanded that she return home. She complied with his request but at the end of three weeks her condition led her to go to her father's home in Grand Rapids, where she stayed until June, 1918, when she was taken to Butterworth hospital at that place. While there, she received letters from her husband chiding her for various things, but offering "to forgive and forget" if she would return home, saying in a letter of June 7th that he was giving her the last warning and wanted action within a week, "sick or no sick." The following month she returned from Butterworth hospital to her home in Chicago where she remained until the following May with the exception of two weeks in January while in a hospital where she gave birth to their child. During these intervals, she was in a state of great depression, had recurrences of her so-called spells and obsessions, and even thought of drowning the baby. Under their influence, she again left her home unknown to her husband, and having borrowed money from a neighbor for that purpose went back to Grand Rapids in May, 1919, remaining there with her father or relatives until July, when she was again taken to St. Mary's Hill. She remained there until just before Christmas 1919 with no marked improvement, when she returned to Grand Rapids. In January, 1920, she was taken to the Psychopathic hospital at Ann Arbor, insane, and was so judicially adjudged in March, 1920. She remained in that institution until October, 1920, when she was permitted to return to her father's house apparently recovered, where she has been ever since.

The bill was filed in the following March.

From the time she left her husband in May, 1919, she had no direct word or support from him, and all of her expenses were borne by her father, including those for support of the child. Her husband took the position that her place was at home, and in about two months, getting no word from her directly, closed their apartment and sold all of the furniture and house

belongings, including some of hers, and sent certain trunks containing her goods to her father.

He testified that he never considered she was ill but that she had a mean disposition, and that he told her so; that when she left for Grand Rapids in May, 1919, it was without his knowledge; that he received a telegram of her arrival there and a request from her cousin that he come on, but that he wrote her father that her place was at home and he would take her back any time, and that her father should bring her back; that he closed his apartment because his wife not returning he could not afford to keep it open; that he did not know his wife had been adjudged insane or how long she was in the Psychopathic hospital, and was not interested in knowing what had become of her "to that extent," although it appeared that notice of proceedings to declare her insane was sent by registered mail to his address in Chicago, and he did not deny receiving the same.

We deem it unnecessary to review at length the testimony bearing upon the relations of the parties prior to their separation in May, 1919. From the evidence, we cannot say that before that time his conduct was such as would either support an action for divorce by her or warrant holding that she was justified in leaving him. Nor do we attribute fault to her in going to her father's in May, 1919, considering her then state of mind. The testimony tends to show that upon her arrival there she was deemed insane. The history of her mental condition, both before and after that time, indicates that her conduct was due to a disordered state of mind and not, as claimed by her husband, to her disposition. Apparently he failed to realize her real physical and mental condition and to extend to her the sympathy and attention her case demanded.

But not being able to say that the separation in May, 1919, was due to such fault of either of the parties as would support an action by the other, the question arises whether the continuance of the separation after

her restoration to sanity was entirely without her fault.

When asked whether she was then willing, or had ever been willing since she left her husband the last time, to go back and live with him as his wife, she answered, "No," that her love for him was gone. On the other hand it appeared that up to about July, 1919, when he closed his home, not having heard directly from her, he stood ready and willing to receive and support her. While she evidently had reason to complain of his neglect of her during the separation, yet upon the facts stated we think after she had regained her sanity she should have offered to return to her husband. (*Thomas v. Thomas,* 152 Ill. 577.) It has been held in a case of enforced separation because of a wife's ill health that she could not claim desertion without an offer to return to her husband. (*Keech v. Keech,* L. R. 1 Prob. & Div. 641.)

While in the case at bar it may be said that the wife was without fault, as that term is understood in law, before the recovery of her sanity and health, it cannot be said, without proof of conduct on the part of her husband justifying separation (*Hosto v. Hosto,* 183 Ill. App. 463) or an offer in good faith to return to him or to effect a reconciliation (*Thomas v. Thomas, supra*) she is without fault in refusing to resume marital relations. Without such proof or offer, she stands in the position of consenting to the separation. It was said in *Johnson v. Johnson,* 125 Ill. 510, that if the wife leaves the husband voluntarily or by consent, it is not without her fault within the meaning of the law. And we may repeat here what was said there that no encouragement can be given to the living apart of the husband and wife, and "incompatibility of disposition, occasional ebullitions of passion, trivial difficulties or slight moral obliquities" will not justify separation.

As, therefore, she stands unwilling to return to him, and he stands apparently willing and requiring that

she should return, and as there was no proof of actionable misconduct on his part, we think she cannot maintain her suit.

The point is made that there having been no legal proceedings for her discharge from the institution where she was confined by the judgment of the court for insanity she cannot maintain the suit. It has been held, however, that the fact that a woman was discharged from an insane asylum in improved condition but not well did not render her incompetent to maintain an action for divorce some time later. (*Ellis v. White*, 61 Iowa 644.) If complainant, even though entitled to relief, was not in a state of mind to consent to the institution of the proceedings, which involved an act of reason, the point, if properly raised, would be pertinent. There was proof, however, tending to show that she was sane at the time of filing the bill, and that under the laws of the State of Michigan was so regarded after her release from the institution. We think it is enough to say, however, that the suit having been brought in her name the question of her sanity could be raised only by a plea in abatement.

The decree will be affirmed.

*Affirmed.*

GRIDLEY, P. J., and FITCH, J., concur.